[No. B098962. Second Dist., Div. Three. Mar. 19, 1997.]

ERNANI BERNARDI, Plaintiff and Respondent, v.
CITY COUNCIL OF THE CITY OF LOS ANGELES et al., Defendants
and Appellants.

## COUNSEL

James K. Hahn, City Attorney, Dov S. Lesel, Assistant City Attorney, Kane, Ballmer & Berkman, R. Bruce Tepper, Jr., June Ailin, De Witt W. Clinton, County Counsel, Manuel Valenzuela, Deputy County Counsel, Rutan & Tucker, Jeffrey M. Oderman, Brobeck, Phleger & Harrison, White & Case, Dan Woods, Christopher W. Kelly and Linda J. Bozung for Defendants and Appellants.

Barbara S. Blinderman, Jeffrey S. Cohen, Kaplanis and Grimm and Trevor A. Grimm for Plaintiff and Respondent.

Jonathan M. Coupal as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

KLEIN, P. J.—Defendants and appellants the City of Los Angeles (the City) and the City Council of the City of Los Angeles (the City Council)

(sometimes collectively referred to as the City), the Community Redevelopment Agency of the City of Los Angeles (the CRA), and the Los Angeles Unified School District (LAUSD) (collectively appellants) appeal an order denying their motion to modify a judgment.[1]

The issue presented is whether the trial court correctly held in 1995 that it lacked jurisdiction to modify a 1977 stipulated judgment validating the subject redevelopment plan.

We conclude the trial court's ruling was proper because the validation judgment is binding and conclusive, and the fiscal cap and time limit contained therein are integral parts of the judgment and likewise are not modifiable. The order therefore is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Redevelopment controversy and resulting stipulated judgment.*

On July 18, 1975, the City Council approved a redevelopment plan (the Plan) for the Central Business District Redevelopment Project (the Project). The Project encompassed 1,549 acres of downtown Los Angeles which the City Council determined to be in a "blighted" condition. The general bounds of the Project area were the Hollywood Freeway to the north, the Harbor Freeway to the west, the Santa Monica Freeway to the south, and Alameda Street to the east.

On September 17, 1975, respondent Ernani Bernardi (Bernardi), a member of the City Council and a city resident, filed an action to invalidate any finding of blight by the City or the CRA, to invalidate the Plan and the ordinance adopting the Plan, and to overturn as unconstitutional Health and Safety Code section 33000 et seq., the Community Redevelopment Law.[2,3] Bernardi also filed a petition for writ of mandate to invalidate the Plan, which petition was consolidated with the complaint.

To resolve the litigation, the various parties ultimately entered into a stipulation for judgment. The parties to the stipulation included the plaintiffs, as well as the City, the City Council, the CRA, the County of Los Angeles (County), the Los Angeles County Flood Control District (Flood

[1] The Howard Jarvis Taxpayers Association and Paul Gann's Citizens Committee filed an amicus curiae brief in support of respondent Bernardi's position.

[2] All further statutory references are to the Health and Safety Code, unless otherwise indicated.

[3] An amended complaint followed in which Bernardi was joined by Philip E. Watson, Donald Lorenzen, Monroe F. Richman, M.D., and Citizens Legal Defense Alliance, Inc.

Control District), the Los Angeles City Community College District (Community College District), and the LAUSD. The stipulation provided for entry of a judgment conforming in form and content to the document which was attached to the stipulation as an exhibit. The stipulation provided: "Each and every party hereto hereby waives any right of appeal, whether direct, indirect or by collateral attack, which may arise from this action, . . . ."

The trial court accepted the stipulation and entered judgment accordingly.[4]

The stipulated judgment filed November 22, 1977, provides in relevant part: "IT IS ORDERED, ADJUDGED AND DECREED as a judgment which is *and shall be forever binding and conclusive*[5] upon the parties hereto and all persons interested in the validity of the Central Business District Redevelopment Project, as follows: [¶] [Section 1] . . . Ordinance No. 147,480 of the Council of the City of Los Angeles approving and adopting the Redevelopment Plan for the Central Business District Redevelopment Project is hereby declared to be adequate, sufficient, legal and valid in all respects. . . . [¶] The Redevelopment Plan for the Central Business District Redevelopment Project and the Central Business District Redevelopment Project are hereby declared to be adequate, sufficient, legal and valid in all respects." (Italics added.)

Section 3 of the validating judgment imposed certain restrictions on the City and the CRA, stating: "Defendants . . . City Council of the City of Los Angeles, City of Los Angeles and [the CRA] shall conform to, comply with and be bound by the following limitations, controls and criteria for the implementation of the Redevelopment Plan for the Central Business District . . . : [¶] . . . [¶] V. FISCAL AND OPERATIONAL LIMITATIONS [¶] A. During the life of the program the Agency may receive no more than the total sum of *Seven Hundred and Fifty Million Dollars ($750,000,000)* from tax increment funds for use in connection with this Project. . . . [¶] . . . [¶] E. In order to clarify the intent of the Council in regard to the 35-year period now found in Section 800 of the Redevelopment Plan, it is declared that such period applies only to the land use covenants and controls to be imposed pursuant to the Redevelopment Plan. *The Agency shall not incur any debt repayable from the tax increments in connection with the Project at any time after July 19, 1995.*" (Italics added.)

---

[4]In signing the judgment, the trial court crossed out language signifying its "approval" of the judgment and instead, interlineated its "acceptance" of the stipulation.

[5]This provision was consistent with the language of section 33503, which provides a judgment validating a redevelopment plan "shall be forever binding and conclusive, as to all matters therein adjudicated or which at that time could have been adjudicated, . . ."

## 2. *Subsequent developments.*

In 1986, the City was advised that in order to conform to the Legislature's newly enacted section 33333.4, which amended a portion of the statutory framework, the City was required to adopt an ordinance imposing a time limit on the establishment of debt to finance the Project and a limit on the amount of tax increment funds that may be allocated to the CRA under the Plan.[6] At that juncture, the CRA proposed raising the tax increment spending limit from $750 million to $7.1 *billion,* and extending the debt establishment time limit from July 1995 to July *2010.*

Pursuant to the new statute, the City adopted an ordinance setting certain limits on the CRA. In accordance with the CRA's proposal, the new ordinance capped the tax dollars allocable to the CRA at $7.1 billion, and precluded the CRA from incurring debt beyond the year 2010. However, the new ordinance also stated "[t]he limitations established in . . . this Ordinance are *subject to* applicable limitations previously established for the . . . Project in the [stipulated] Judgment entered in that certain litigation involving the . . . Project . . . ." (Italics added.)

On December 21, 1993, as part of an effort to have the $750 million spending cap set aside, various governmental entities affected by the restrictions in the 1977 judgment entered into a series of related agreements as follows: an agreement for allocation of increment funds among the CRA, the City, the Flood Control District and the County; a fiscal agreement between the CRA and the Community College District; and a fiscal agreement between the CRA and LAUSD. These agreements expressly contemplated the 1977 judgment would be modified to permit the CRA to receive additional tax increment revenues, which in turn would inure to the benefit of the other governmental entities.

On July 7, 1995, nearly 18 years after entry of the stipulated judgment, and with the July 19, 1995 deadline for incurring debt imminent, the City, the City Council, the CRA and the LAUSD, as well as the County, the Flood Control District, and the Community College District, filed a motion "for order confirming settlement agreement[s] and modifying judgment."

The "settlement agreements" set forth above, to which the motion referred, did not include Bernardi or any of the other plaintiffs in the original

---

[6]Section 33333.4 required adoption of an ordinance specifying a limit on the amount of tax monies to be divided and allocated to the redevelopment agency, as well as a time limit on the establishing of loans, advances and indebtedness to finance the redevelopment project. (§ 33333.4, subd. (a)(1), (2); Stats. 1985, ch. 639, § 1, p. 2221.)

validation action, and were not a postjudgment settlement of the validation action, which, as indicated, had been resolved by a stipulated judgment. Instead, the proffered "settlement agreements" were the December 1993 agreements between the various moving parties. In said agreements, the other governmental entities committed their support to the efforts of the City and CRA to modify the fiscal cap in return for sharing in the proceeds if a court could be persuaded to modify the 1977 validating judgment. Thus, these purported "settlement agreements" were in fact a broad-based effort by various governmental entities to obtain a judicial *modification* of the 1977 validating judgment.

The July 7, 1995 modification motion sought two changes in the 1977 stipulated judgment—a deletion of the fiscal cap and an extension of the deadline for the CRA to incur debt payable with tax increment from July 19, 1995 to January 1, 2004, subject to one further ten-year extension. The motion invoked the *equitable jurisdiction* of the superior court, asserting that the ability of the CRA to fulfill its mission "had been radically undercut by a series of unforeseen and unforeseeable changes in circumstances,"[7] and that the changed circumstances had rendered the cap inequitable.

Bernardi filed opposition to the motion, contending the 1977 judgment was final, the judgment did not include any injunctive relief, the court had no inherent equitable jurisdiction because a *validation action* is a special proceeding and the court was without jurisdiction to vacate or modify the final judgment. Bernardi also opposed the motion on the ground the trial court did not have personal jurisdiction over all the parties to the 1977 judgment, appellants herein having failed to notify any of his fellow plaintiffs in the validation action.

### 3. *Trial court's ruling.*

On October 3, 1995, the trial court heard the motion and ruled it lacked jurisdiction to grant the requested relief. The trial court "note[d] that the 1977 judgment in this case was constructed via stipulation in which the parties agreed to 'waive any right of appeal . . . which may arise from this action . . . .' The agreement further states that the judgment 'is and shall be forever binding . . . .' Further, the matter was a validation action, a special

---

[7]These allegedly unforeseeable circumstances included a drastic reduction in tax increment revenues due to Proposition 13, unprecedented inflation in the Southern California real estate market, increased costs due to soaring interest rates, the need to provide shelter and services to the growing homeless population, and the virtual elimination of federal funding for the Plan.

proceeding, the court declares—a proceeding in rem.[8] As such, the court may not exercise what the moving parties now characterize as the court's 'inherent powers of equity,' lacking the jurisdiction to grant the relief requested."

This appeal followed.[9]

## CONTENTIONS

The City and the CRA contend the trial court had jurisdiction to modify the fiscal cap by granting the July 7, 1995, motion, the restrictions found in section 3 of the judgment are not an integral part of the validation of the redevelopment plan and therefore are subject to the trial court's inherent power to modify injunctive orders, and denial of the motion was an abuse of discretion.

The LAUSD contends the trial court erred: in refusing to exercise jurisdiction; in finding the fiscal cap was a validating judgment; in finding it lacked jurisdiction to modify a validating judgment; and in finding it lacked jurisdiction to modify a stipulated judgment.

## DISCUSSION

1. *Trial court had jurisdiction to entertain the motion to modify the judgment.*

Before examining whether the trial court correctly ruled it lacked jurisdiction to modify the 1977 judgment, we examine the threshold issue as to whether the trial court had jurisdiction in the first instance to entertain appellants' modification motion.

As the Supreme Court stated in *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 302-303 [109 P.2d 942, 132 A.L.R. 715], ". . . a tribunal has jurisdiction to determine its own jurisdiction. This is a truism, and, subject to certain implicit limitations, is ordinarily a correct statement

---

[8]As explained in Discussion, part 2.d., *post*, a validation action is a proceeding in rem operating against property (Code Civ. Proc., § 860), while an injunction operates against persons. Because the 1977 validating judgment was not injunctive in nature, the trial court properly ruled appellants could not invoke the inherent power of the court to modify injunctions. (*Union Interchange Inc. v. Savage* (1959) 52 Cal.2d 601, 604 [342 P.2d 249]; *Palo Alto-Menlo Park Yellow Cab Co. v. Santa Clara County Transit Dist.* (1976) 65 Cal.App.3d 121, 130 [135 Cal.Rptr. 192].)

[9]The trial court's ruling it lacked jurisdiction to modify the 1977 judgment is appealable as an order after judgment. (Code Civ. Proc., § 904.1, subd. (a)(2).)

of law. It has its origin mainly in the cases holding that a court has inherent power to inquire into jurisdiction of its own motion, regardless of whether the question is raised by the litigants. [Citations.] It rests also upon the theory that until the court determines that it has jurisdiction and does some act in consequence, there can be no injury to the party who denies its jurisdiction. [Citation.] It means only that the trial court or lower tribunal or body to which the question is submitted has such jurisdiction to make the first preliminary determination—not a final one; and no interference is permitted until it does decide the matter one way or the other."

Once the tribunal has determined it has jurisdiction, ". . . the question is no longer of jurisdiction to *determine*, but of jurisdiction to *act*. And jurisdiction to act is always a subject of inquiry by a higher court." (*Abelleira* v. *District Court of Appeal, supra*, 17 Cal.2d at p. 303.)

Thus, the trial court had jurisdiction to examine whether it had jurisdiction to modify the 1977 judgment. The trial court proceeded to consider the issue and concluded it was without jurisdiction to modify the judgment. We now review whether the trial court properly found it lacked jurisdiction to modify the 1977 judgment.

2. *Trial court correctly held it lacked jurisdiction to modify the 1977 judgment.*

a. *Overview of redevelopment law.*

■ To ascertain whether the 1977 judgment validating the instant redevelopment plan was subject to modification, we commence with a brief overview of the redevelopment law, codified in section 33000 et seq.

"California's redevelopment law was first passed in the 1950's. [Fn. omitted.] The stated purpose is to present communities with a vehicle by which to eliminate the physical, social and economic liabilities characteristic of blighted areas. [¶] The redevelopment process [fn. omitted] begins when a community forms a Redevelopment Agency (Agency) which, along with the planning commission, identifies a predominantly urbanized, blighted area and designates it a redevelopment or project area. A plan for the project area is formulated and ultimately adopted by the local government body. Though an Agency is given broad powers to implement this plan, it does not have the power nor ability to levy a tax to finance these efforts. [Citations.] Instead, the Agency obtains the funds needed to acquire property and make improvements by accepting financial assistance from any public or private source, borrowing money, and issuing bonds. Incurrence of debt is by far the

most common method utilized by an Agency. This is done through the issuance of 'tax allocation bonds.' The primary source of repayment of this indebtedness is 'tax increments' received by the agency from governmental taxing agencies. ▮ The mechanics of tax increment financing was described in *Redevelopment Agency of San Bernardino* v. *County of San Bernardino* (1978) 21 Cal.3d 255, 259 [145 Cal.Rptr. 886, 578 P.2d 133].) '[I]f, after a redevelopment project has been approved, the *assessed valuation of taxable property* in the project increases, the taxes levied on such property in the project area are divided between the taxing agency and the redevelopment agency. The taxing agency receives the same amount of money it would have realized under the assessed valuation existing at the time the project was approved, while the additional money resulting from the rise in assessed valuation is placed in a special fund for repayment of indebtedness incurred in financing the project.' (Italics in original.) The increase in assessed valuation occurs because of the new construction and revitalization in the project area. Once the debt is paid, the additional tax revenues revert back to the taxing agency. The Legislature devised this financing scheme so that redevelopment would largely pay for itself." (*Bell Community Redevelopment Agency* v. *Woosley* (1985) 169 Cal.App.3d 24, 27 [214 Cal.Rptr. 788].)

  b.  *Statutory scheme for resolving validity of a redevelopment plan by means of a validation action resulting in a binding and conclusive validating judgment.*

The 1977 judgment validating the Plan was the product of a *validation* action filed by Bernardi and others in opposition to the Plan. The redevelopment law, at section 33500 et seq., specifically provides for proceedings to test the validity of a redevelopment plan, and for rendition of a binding and conclusive validating judgment determining the validity of such a plan. (§§ 33502, 33503.) Code of Civil Procedure section 860, in a chapter of that code authorizing the institution of validating proceedings, provides a validation action "shall be in the nature of a proceeding *in rem.*" (Italics added.)

Such a proceeding to challenge the validity of a redevelopment plan may be filed within 60 days of the enactment of an ordinance adopting a redevelopment plan. (§§ 33500, 33501.) The action "may be brought pursuant to [Code of Civil Procedure section 860 et seq.] to determine the validity of bonds and the redevelopment plan to be financed or refinanced, in whole or in part, by the bonds, or to determine the validity of a redevelopment plan not financed by bonds, including without limiting the generality of the foregoing, the legality and validity of all proceedings theretofore taken for or in any way connected with the establishment of the agency, its authority to

transact business and exercise its powers, the designation of the survey area, the selection of the project area, the formulation of the preliminary plan, the validity of the finding and determination that the project area is predominantly urbanized, and the validity of the adoption of the redevelopment plan, and also including the legality and validity of all proceedings theretofore taken . . . ." (§ 33501.)

The judgment in the validation action determines the validity of the redevelopment plan. (§§ 33502, 33503; see, e.g., *Regus* v. *City of Baldwin Park* (1977) 70 Cal.App.3d 968, 971 [139 Cal.Rptr. 196].) Section 33503, pertaining to the finality of such a judgment, provides: "The judgment, if no appeal is taken, or if taken and the judgment is affirmed *shall be forever binding and conclusive, as to all matters therein adjudicated or which at that time could have been adjudicated*, against the agency and against all other parties and if the judgment determines that the agency is lawfully established, that the redevelopment plan is valid and effective, that the agency is authorized to issue such bonds and that such bonds when issued will be valid, the judgment shall permanently enjoin the institution by any person of any action or proceeding raising any issue as to which the judgment is binding and conclusive." (Italics added.)

  c.  *The fiscal and time limitations of the 1977 validating judgment are integral parts thereof and therefore are as binding and conclusive as the validating provision therein.*

■■■ Appellants acknowledge that under the statutory scheme, the 1977 judgment is binding and conclusive insofar as it validated the Plan. Appellants argue, however, section 3 thereof, imposing the fiscal cap and debt deadline on the CRA, did not concern the "validity" of the Plan and therefore is not an integral part of the validating judgment. Thus, according to appellants' theory, although section 1 of the validating judgment, declaring the Plan "legal and valid in all respects," is binding and conclusive, the restrictions in section 3 are subject to modification in appropriate circumstances. Appellants' argument is without merit.

As noted, under the statutory scheme a validating judgment is "forever binding and conclusive, as to all matters therein adjudicated." (§ 33503.) The matters contained in the instant validating judgment included a fiscal cap and a deadline for incurring debt. We are mindful that the validating judgment was the product of a *stipulation* among the parties in which the trial court acquiesced, rather than a judicial determination as to the Plan's validity; the parties entered into a quid pro quo whereby appellants agreed to various limits on the Plan in exchange for Bernardi's withdrawing his

challenge to the Plan's validity. It was the resulting stipulated judgment which allowed the Project to go forward at that time.

Without the limitations found in section 3 of the judgment, there would not have been a stipulated validating judgment. Although appellants now seek to avoid the very terms to which they agreed, the limitations of section 3 of the stipulated judgment are inextricably intertwined with the validating language of section 1 and cannot be severed.

The conclusion that the subject restrictions of section 3 are integral parts of the validating judgment is bolstered by the fact that subsequent legislation required the imposition of precisely such restrictions on redevelopment plans. (§§ 33333.2, 33333.4.)

Therefore, contrary to appellants' position, the validating judgment does not consist merely of section 1 thereof, declaring the ordinance and Plan to be "adequate, sufficient, legal and valid in all respects." The fiscal and time limitations of section 3 are also part and parcel of the validating judgment. Because these limitations on the CRA are integral parts of the judgment, they are no less binding and conclusive than the judgment's determination of the Plan's validity, which appellants recognize as absolute. (§ 33503.)

In a related argument, appellants aver the presence of the fiscal cap in the 1977 judgment has no bearing on the judgment's determination that the Plan is valid because when the Plan was adopted in 1975, the statutory scheme did not require a limit on tax increment revenue. Therefore, according to appellants, the Plan was legally sufficient and valid regardless of the presence of any fiscal cap provision.

Appellants' argument fails to meet the issue. Irrespective of whether the instant Plan might have been adjudged valid had the litigation been pursued, the matter was resolved by *stipulation*. Therefore, at this juncture, appellants cannot argue the finding of blight and the Plan would have been upheld by the courts and that therefore the restrictions of section 3 are not integral parts of the stipulated judgment.[10]

d. *The validation action was a proceeding in rem and therefore the validating judgment is not modifiable as an injunctive order.*

In another theory to escape the finality of the validating judgment, appellants seek to characterize the fiscal and time limits therein as injunctive in

---

[10]We recognize section 33450 authorizes a legislative body by ordinance to amend an existing redevelopment plan upon the recommendation of the redevelopment agency. Here, however, the issue is not an amendment to the Plan, but rather, whether jurisdiction exists to modify the 1977 validating *judgment*.

nature and therefore modifiable. According to appellants, section 3 of the validating judgment is injunctive and modifiable because it *prohibits* the CRA from receiving more than $750 million in tax increment funds and from incurring debt beyond July 19, 1995. The contention these limitations in the judgment amount to a continuing injunction is without merit.

As noted by the trial court, a validation action is "a proceeding in rem." (Code Civ. Proc., § 860.) Code of Civil Procedure section 860 et seq., which authorizes public agencies or interested persons to bring validation proceedings (Code Civ. Proc., §§ 860, 863), specifically applies to actions questioning the validity of redevelopment plans. (§ 33501.)[11] Clearly, a validation action to determine the validity of a redevelopment plan is a proceeding in rem, operating against property, not persons.

In contrast, " '[a]n injunction is obviously a personal decree. It operates on the person of the defendant by commanding him to do or desist from certain action.' " (*Comfort* v. *Comfort* (1941) 17 Cal.2d 736, 741 [112 P.2d 259].) Because the 1977 validating judgment was in rem rather than injunctive in nature, appellants could not, in 1995, invoke the inherent power of the court to modify an executory injunctive decree. (*Sontag Chain Stores Co.* v. *Superior Court* (1941) 18 Cal.2d 92, 95 [113 P.2d 689].)

Additionally, injunctive relief lies to prevent threatened injury from a "wrongful act." (*Brownfield* v. *Daniel Freeman Marina Hospital* (1989) 208 Cal.App.3d 405, 410 [256 Cal.Rptr. 240]; accord, *Gold* v. *Los Angeles Democratic League* (1975) 49 Cal.App.3d 365, 372 [122 Cal.Rptr. 732].) Here, there was no wrongful act to be enjoined in 1977. No injunction would have issued at that time to enjoin the CRA from receiving more than $750 million in tax increment funds or from incurring debt after July 19, 1995, because there was no law that made such conduct wrongful. These restrictions were not judicially imposed to enjoin a wrongful act, but rather, derived from the agreement of the parties. Therefore, we reject appellants' attempt to transform the stipulated limits of the validating judgment into a continuing prohibitory injunction subject to modification. (*Sontag Chain Stores Co.* v. *Superior Court, supra,* 18 Cal.2d at pp. 94-95; 7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, § 83, pp. 518-520.)[12]

---

[11]Section 33501 states in part: "(a) An action may be brought pursuant to Chapter 9 (*commencing with Section 860*) *of Title 10 of Part 2 of the Code of Civil Procedure* to determine the validity of bonds and the redevelopment plan . . . ." (Italics added.)

[12]Even where a court which renders an equitable decree reserves jurisdiction to implement the decree, " '[t]he jurisdiction reserved is to modify procedural provisions, not to materially change the adjudication of substantial issues.' " (*Palo Alto-Menlo Park Yellow Cab Co.* v. *Santa Clara County Transit Dist., supra,* 65 Cal.App.3d at p. 130; accord, *Orban Lumber Co.* v. *Fearrien* (1966) 240 Cal.App.2d 853, 855-856 [50 Cal.Rptr. 41]; see generally, 7 Witkin,

## CONCLUSION

The fiscal and time restrictions contained in section 3 of the validating judgment are integral parts thereof and are as binding and conclusive as the determination in the judgment that the Plan was valid in all respects. Appellants cannot unilaterally change the terms of their agreement with Bernardi, an agreement which was perfected in a stipulated judgment. Nor can appellants collaterally attack the validating judgment, a decree which long ago became "forever binding and conclusive." (§ 33503.)

## DISPOSITION

The order is affirmed. Appellants to bear costs on appeal.

Kitching, J., and Aldrich, J., concurred.

A petition for rehearing was denied on April 18, 1997, and the following opinion was then rendered:

**THE COURT.\***—The authorities cited in the petition for rehearing are inapposite as explained in this supplemental opinion upon denial of rehearing (see, e.g., *City of Oakland* v. *Nutter* (1970) 13 Cal.App.3d 752, 775 [92 Cal.Rptr. 347]).

Relying on *City of Ontario* v. *Superior Court* (1970) 2 Cal.3d 335 [85 Cal.Rptr. 149, 466 P.2d 693], appellants argue the fiscal cap was an in personam provision and therefore modifiable, rather than an in rem provision of the validating judgment.

In *City of Ontario,* in addition to praying for a declaration invalidating a development scheme, the plaintiffs prayed for "(1) an injunction restraining the parties from spending any funds or doing any other acts in furtherance of the speedway project, and (2) an order compelling the parties to make restitution to [the] City of all money unlawfully paid out in connection with the project." (*City of Ontario* v. *Superior Court, supra,* 2 Cal.3d at p. 344.) *City of Ontario* observed, "[n]either of these latter remedies owe[d] its existence to chapter 9 [Code Civ. Proc., § 860 et seq.] . . . . [¶] . . . Nothing in the general validating statute contemplates such an in personam cause of action for repayment of public money unlawfully expended, and . . . no reason appears to deny plaintiffs their normal remedy in this regard." (*Id.,* at pp. 344-345.)

---

Cal. Procedure, *supra,* Judgment, §§ 81, 82, pp. 516-518.) Here, the fiscal cap and 1995 debt deadline were substantive, not merely procedural, provisions of the judgment.

\*Before Klein, P. J., Kitching, J., and Aldrich, J.

Here, in contrast to what was prayed for in *City of Ontario*, the proceeding initiated by Bernardi was simply an action in rem, to invalidate the instant redevelopment plan. The fact the resultant validating judgment imposed certain fiscal and time parameters on the plan did not transform the cause of action into an in personam proceeding.

Citing *Starr* v. *City and County of San Francisco* (1977) 72 Cal.App.3d 164 [140 Cal.Rptr. 73], appellants contend even validating judgments are not immune from modification upon a showing of changed circumstances.

The *Starr* court applied the plain language of Code of Civil Procedure section 870, which states a validating judgment is " 'forever binding and conclusive, as to all matters therein adjudicated *or which at that time could have been adjudicated,* . . .' " (*Starr* v. *City and County of San Francisco, supra*, 72 Cal.App.3d at p. 177.) The question presented in *Starr* was "whether the issues [t]herein sought to be raised by appellants [were] matters which 'at that time could have been adjudicated.' (Code Civ. Proc., § 870.)" (*Ibid.*) *Starr* found a certain "issue could not have been adjudicated at the time of the prior action and that appellants [were] not thereby prevented from raising it under Code of Civil Procedure section 870 or the doctrine of res judicata." (*Id.*, at p. 179.)

Here, the fiscal cap and time limitation not only could have been adjudicated, but *actually were adjudicated* by the stipulated judgment. Therefore, said restrictions on the plan are binding and conclusive. (Code Civ. Proc., § 870; Health & Saf. Code, § 33503.)

Finally, appellants cite case law for the proposition that a party's stipulation to a judgment does not prevent a court from exercising jurisdiction to modify the judgment, upon a change of circumstances.

■ Clearly, a "consent decree mandating future compliance with a statutory obligation does not invest the parties thereto with a contractual right to demand continued performance *in the event that the underlying statutory obligation is changed.* [Citations, fn. omitted.]" (*Welfare Rights* v. *Frank* (1994) 25 Cal.App.4th 415, 423 [30 Cal.Rptr.2d 716], italics added.) Courts " 'must be free to modify consent decrees *when a change in the law* brings the terms of the consent decree in conflict with statutory objectives.' [Citation.]" (*Mendly* v. *County of Los Angeles* (1994) 23 Cal.App.4th 1193, 1205 [28 Cal.Rptr.2d 822], italics added.)

■ Here, however, appellants are not seeking a modification of the stipulated judgment based upon a change in the law. Rather, the modification

is sought based upon changed *factual* circumstances, such as inflation in the real estate market, increased interest rates, and a growth in homelessness. The cases cited by appellants do not authorize a court to modify a consent decree based upon such a showing.

The petition for rehearing is denied.

No change in judgment.

A petition for a rehearing was denied April 18, 1997, and appellants' petition for review by the Supreme Court was denied June 11, 1997.