[No. A083792. First Dist., Div. Four. Sept. 29, 2000.]

PERRIN EDGERTON et al., Plaintiffs and Respondents, v.
STATE PERSONNEL BOARD, Defendant;
DEPARTMENT OF TRANSPORTATION, Real Party in Interest and
Appellant.

## Counsel

K. William Curtis, Kenneth R. Hulse and Christopher E. Thomas for Real Party in Interest and Appellant.

Leonard, Carder, Nathan, Zuckerman, Ross, Chin & Remar, Lynn Rossman Faris and Philip C. Monrad for Plaintiffs and Respondents.

## Opinion

**HANLON, P. J.**—This appeal concerns the propriety of employee drug testing during off-duty work hours. The Department of Transportation (Caltrans) appeals from a judgment entered in favor of respondents International Union of Operating Engineers (IUOE) and Perrin Edgerton directing Caltrans to reinstate Edgerton to his former position with backpay, and from the judgment in favor of IUOE granting IUOE's motion for summary adjudication and enjoining Caltrans from conducting follow-up drug tests during an employee's off-duty time. Caltrans contends that the trial court erred in setting aside the State Personnel Board's decision terminating Edgerton based on a positive drug test, that off-duty drug testing does not violate an employee's constitutional right to privacy, and that the court erred in awarding attorney fees to respondents. We affirm.

### Factual Background

In October 1995, Edgerton, an equipment operator for Caltrans, failed a random drug test by testing positive for marijuana. Caltrans issued a notice of adverse action and dismissed Edgerton effective November 17, 1995. Edgerton and Caltrans thereafter entered into a stipulated settlement before the State Personnel Board (Board). Pursuant to the settlement, Caltrans agreed to reduce Edgerton's dismissal to a suspension of 20 working days

and Edgerton agreed to remain drug and alcohol free and to submit to random follow-up drug testing.

In January 1996, Edgerton failed a follow-up drug test by testing positive for methamphetamines. Again, Caltrans issued a notice of adverse action and dismissed Edgerton. Edgerton appealed the dismissal to the Board. The Board sustained the dismissal.

On December 13, 1996, Edgerton and IUOE filed a combined petition for writ of administrative mandamus and a complaint. The writ sought to compel the Board to set aside its decision sustaining Edgerton's dismissal. The complaint sought declaratory and injunctive relief against Caltrans on the ground that off-duty drug testing infringed on an employee's right to privacy. On June 16, 1997, the superior court granted the petition, finding that the Board's decision denied Edgerton a fair hearing. The court found that the Board's decision was not supported by substantial evidence because Caltrans did not meet its burden of proving the chain of custody tracking Edgerton's urine specimen from the first laboratory that tested it to the second confirmatory laboratory. The court further found that the Board abused its discretion by excluding evidence that Edgerton was ordered to submit to a drug test in violation of Caltrans policy.

The parties thereafter filed cross-motions for summary judgment or summary adjudication on Edgerton and IUOE's complaint. Edgerton and IUOE contended that Caltrans's practice of conducting off-duty drug testing violated an employee's right to privacy and that IUOE was entitled to a permanent injunction because it was reasonably probable that Caltrans would continue to order off-duty drug testing. Caltrans argued that there was no evidence that Edgerton's right to privacy was violated and that IUOE had failed to demonstrate that it was entitled to injunctive relief. The superior court granted IUOE's motion for summary adjudication, finding that off-duty drug testing intruded upon an employee's privacy interests and that Caltrans's countervailing interests could be achieved by less intrusive means of testing including on-duty testing or testing contiguous to an employee's on-duty time. The court denied Edgerton's motion alleging a violation of his right to privacy, concluding that a triable issue of fact existed as to whether he was tested during off-duty time.[1] The court issued a permanent injunction prohibiting Caltrans from conducting off-duty drug testing of its employees unless the testing was necessary to comply with federal regulations.

Edgerton and IUOE thereafter moved for attorney fees under Code of Civil Procedure section 1021.5, contending that their action enforced employees' fundamental right to privacy in their off-duty time. The superior

[1]Pursuant to a settlement agreement with Caltrans, Edgerton subsequently withdrew this claim.

court granted IUOE's motion, awarding it $86,671 plus a 1.5 multiplier, for a total fee award of $130,006.50. The court denied Edgerton's motion for fees.

DISCUSSION

## 1. *The Writ*

 Caltrans contends that the trial court erred in overturning the Board's decision because substantial evidence was adduced at the hearing to support the Board's decision terminating Edgerton.

 "[T]he Board is a statewide administrative agency deriving its adjudicative powers from the California Constitution; accordingly, its factual determinations must be upheld by a reviewing court if they are supported by substantial evidence, with all legitimate and reasonable inferences drawn in support of such findings." (*Stanton v. State Personnel Bd.* (1980) 105 Cal.App.3d 729, 734 [164 Cal.Rptr. 557].)

 In order to prove that Edgerton failed a drug test, Caltrans was required to show that a medical review officer (MRO) reviewed the positive test result for "possible alternative medical explanations" and reviewed "the chain of custody to ensure that it is complete and sufficient on its face." (49 C.F.R. § 40.33(a)(1) (1999).)[2] Under the federal regulations, the chain of custody is defined as "[p]rocedures to account for the integrity of each urine or blood specimen by tracking its handling and storage from point of specimen collection to final disposition of the specimen. With respect to drug testing, these procedures shall require that an appropriate drug testing custody form (see § 40.23(a)) be used from time of collection to receipt by the laboratory and that upon receipt by the laboratory an appropriate laboratory chain of custody form(s) account(s) for the sample or sample aliquots within the laboratory." (49 C.F.R. § 40.3 (1999).) In documenting the chain of custody, the testing laboratory is required to complete a chain of custody form documenting "each time a specimen is handled or transferred and [identifying] every individual in the chain of custody . . . ." (49 C.F.R. § 40.25(k) (1999).)

---

[2]"An essential part of the drug testing program is the final review of the confirmed positive results from the laboratory. A positive test result does not automatically identify an employee/applicant as having used drugs in violation of a DOT [United States Department of Transportation] agency regulation. An individual with a detailed knowledge of possible alternate medical explanations is essential to the review of results. This review shall be performed by the [MRO] prior to the transmission of the results to employer administrative officials. The MRO review shall include review of the chain of custody to ensure that it is complete and sufficient on its face." (49 C.F.R. § 40.33(a)(1) (1999).)

Here, the trial court found that "although the MRO certified chain of custody as 'properly completed,' he reviewed no chain of custody documentation (as prescribed by 49 C.F.R. §§ 40.25(k) & 40.29(a) & (b) (1999)) for the internal handling of these urine specimens by either lab, nor did he review external (i.e., shipping & receiving) chain of custody documentation from the first lab [Centinela] to the second lab (PoisonLab)." The court thus found that the MRO's certification that the chain of custody was complete was incorrect, and that Caltrans's failure to prove that the MRO reviewed the external chain of custody from Centinela to PoisonLab rendered PoisonLab's positive test result inadmissible.

Caltrans disputes the trial court's finding, contending that the testimony of Dr. James Lemus, the MRO responsible for reviewing Edgerton's test results, provides substantial evidence that Edgerton tested positive for methamphetamines and that Caltrans was not required to document the shipping of Edgerton's specimen from Centinela to PoisonLab. That testimony and the chain of custody forms that were admitted at the hearing, however, showed only that the Centinela laboratory received Edgerton's urine samples. No evidence was admitted at the hearing documenting the internal chain of custody at either of the testing laboratories.

Edgerton's test was conducted using the "split sample" method. (See 49 C.F.R. § 40.25(f)(10) (1999).) Under the split sample method, the collection site splits the employee's urine sample into two samples of specified volumes and sends both to the laboratory. (49 C.F.R. § 40.25(f)(10)(ii)(A)-(D).) Only the first sample is tested initially; however, if the result is positive, the employee may request that the second sample be tested at a different laboratory. (49 C.F.R. § 40.25(f)(10)(ii)(E).) Here, the record shows that Edgerton's urine sample was split into two samples, "A" and "B." The chain of custody forms indicate that both samples were sent to Centinela on January 24, 1996. Yet Centinela did not conduct the testing of Edgerton's sample A until January 29, 1996. After being notified of the positive test result, Edgerton requested that the second sample be tested. The subsequent confirmatory test of sample B was not conducted until February 21, 1996. In the course of almost one month, there is no documentation of the chain of custody of Edgerton's samples. There is nothing in the record to substantiate the storage and handling of these samples during this period. This lack of documentation was fatal. (Cf. *Frank v. Department of Transp., F.A.A.* (Fed. Cir. 1994) 35 F.3d 1554, 1555-1557 [sample left unattended for a few minutes]; *U.S. v. Burton* (8th Cir. 1989) 866 F.2d 1057, 1058 [after urine specimen was given, it remained in an unlocked box on a secretary's desk until being processed at the close of the day].)

It is well settled that chain of custody documentation is required at the collection site and at the testing laboratory where specimens are vulnerable

to tampering. (*Interstate Brands v. Local 441 Retail, Wholesale* (11th Cir. 1994) 39 F.3d 1159, 1162.) As the trial court found, Caltrans failed to sustain its burden of proving that Edgerton suffered a positive drug test because its documentation of the chain of custody for Edgerton's samples was lacking. Although a violation of chain of custody procedures does not per se invalidate a drug test (see *Frank v. Department of Transp., F.A.A., supra,* 35 F.3d at p. 1556), based on the documentation before him, the MRO did not have enough information to certify that the chain of custody was "complete and sufficient." (49 C.F.R. § 40.33(a) (1999).) Indeed, he had no information before him documenting the chain of custody for Edgerton's samples after they were received by the Centinela laboratory. The positive test results were thus obtained in violation of the federal regulations and failed to support the Board's decision to terminate Edgerton. (49 C.F.R. § 40.33(b)(3) ["The MRO shall not . . . consider the results or urine samples that are not obtained or processed in accordance with this part"].)

Although Caltrans is correct that it was not required to document the use of couriers in the shipment of the samples between laboratories (see 49 C.F.R. § 40.25(k) (1999) ["the chain of custody is not broken, and a test shall not be canceled, because couriers, express carriers, postal service personnel, or similar persons involved solely with the transportation of a specimen to a laboratory, have not documented their participation in the chain of custody documentation"]), the problem presented by the evidence here is that there is no documentation of the internal chain of custody of the samples once they arrived in the custody of the Centinela laboratory. Given this record, the MRO erroneously certified the chain of custody as complete.

Finally, while acknowledging that it bore the ultimate burden of proof in establishing that Edgerton tested positive to a follow-up drug test (see *California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1153 [43 Cal.Rptr.2d 693, 899 P.2d 79]), Caltrans argues that Edgerton had the burden of proving the break in the chain of custody because of the Evidence Code section 664 presumption that official duty has been regularly performed. The record, however, establishes that Edgerton rebutted that presumption. In cross-examining Dr. Lemus, Caltrans's MRO, Edgerton showed that Lemus reviewed no documentation demonstrating the internal chain of custody at Centinela, yet he certified that the chain of custody was complete and sufficient. Further, the documentary evidence admitted at the hearing showed the lack of any internal chain of custody. Finally, counsel for Edgerton argued that chain of custody was at issue and refused to stipulate that there was no break in the chain of custody. Hence, despite the presumption that official duty was regularly performed, the presumption was wholly rebutted here. (See, e.g., *Santos v. Department of*

*Motor Vehicles* (1992) 5 Cal.App.4th 537, 550 [7 Cal.Rptr.2d 10] ["No presumption . . . can supply the missing information when the report of a chemical test result fails to indicate the time the sample was drawn"].)

Alternatively, Caltrans argues that the administrative law judge erroneously placed the burden of proof on Edgerton to show a break in the chain of custody and that a remand is required to allow Caltrans an opportunity to present evidence on the issue. The record shows, however, that Edgerton refused to stipulate that the chain of custody was established; the administrative law judge thus left it up to the parties as to how to proceed on proof of the issue: "[Administrative Law Judge Bowman]: . . . We have no agreement or stipulation that the chain of custody is claimed, and so at this time I have suggested that we go forward with additional testimony. I'll leave it up to [Caltrans's] representative as to whether or not she wishes to place evidence on chain of custody in her direct case, or whether she wishes to see whether it is actually challenged in [Edgerton's] side of the case. And if that is—if that should occur, it will be within her discretion to place rebuttal testimony on the record." Neither party presented any additional evidence on the issue. Nonetheless, the issue was contested in the parties' closing briefs, with Edgerton relying on Lemus's testimony that he did not review any internal chain of custody forms from the laboratories. As Edgerton correctly points out, he was not required to present additional evidence on the issue when dispositive evidence was already in the record. The trial court thus did not err in refusing to remand the case to the Board for further hearing. Caltrans was not entitled to a second opportunity to establish its case. (*Newman v. State Personnel Bd.* (1992) 10 Cal.App.4th 41, 49 [12 Cal.Rptr.2d 601].)

In granting Edgerton's petition for a peremptory writ of mandamus, the trial court also ruled that the Board denied Edgerton a fair hearing because it erroneously excluded evidence that Edgerton was ordered to submit to a drug test in violation of both Caltrans policy and the collective bargaining agreement between Caltrans and IUOE. Caltrans argues that the Board properly excluded that evidence under the parol evidence rule. In light of our conclusion that the Board's decision was not supported by substantial evidence, we need not decide the issue.

### 2. *The Injunction*

■ The trial court granted IUOE's motion for summary adjudication and issued a permanent injunction prohibiting Caltrans from conducting off-duty drug testing. The court found that off-duty drug testing intruded upon an employee's constitutionally protected right to privacy, and that

based on statements of Caltrans's officials responsible for administering Caltrans's drug testing program there was a reasonable probability that Caltrans would order that testing in the future. The trial court's ruling was correct.

In *Loder v. City of Glendale* (1997) 14 Cal.4th 846, 896 [59 Cal.Rptr.2d 696, 927 P.2d 1200], our Supreme Court recognized that an employee drug testing program "unquestionably implicates privacy interests protected by the state Constitution." The court noted that "[t]he disclosure of additional private information through testing a bodily substance obtained from an individual and the increased monitoring of the process under which an individual provides a urine sample constitute intrusions upon the applicant's constitutional privacy interests that are not insignificant or de minimis—intrusions that would not be permissible in the absence of reasonable justification." (*Id.* at p. 897.) The court thus concluded that in determining whether a particular drug testing program is constitutional, the intrusion on an individual's privacy interests must be balanced against the legitimacy and strength of the employer's interest in conducting the testing. (*Ibid.*) " '[T]he [individual], in turn, may rebut [an employer's] assertion of countervailing interests by showing there are feasible and effective alternatives to [the employer's] conduct which have a lesser impact on privacy interests.' " (*Id.* at p. 891, quoting *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 40 [26 Cal.Rptr.2d 834, 865 P.2d 633].)

Caltrans asserts that off-duty drug testing does not intrude upon an employee's privacy interests because an employee has no constitutionally protected interest in lost "personal time." It is settled, however, that "[p]rotected privacy interests under the state Constitution include . . . an interest in making intimate personal decisions or conducting personal activities without observation, intrusion or interference (autonomy privacy) . . . ." (*Smith v. Fresno Irrigation Dist.* (1999) 72 Cal.App.4th 147, 160 [84 Cal.Rptr.2d 775]; see also *Loder v. City of Glendale, supra,* 14 Cal.4th at p. 894 [drug testing intrudes on an individual's autonomy privacy insofar as it requires an individual to provide a urine sample in a monitored setting].) And, at least one court has recognized that an employee has an expectation of privacy in his home that would be violated even if the employee agreed to permit the employer to search his home for drugs during off-duty hours. (*Semore v. Pool* (1990) 217 Cal.App.3d 1087, 1097 & fn. 4 [266 Cal.Rptr. 280]; see also *Jones v. McKenzie* (D.C. Cir. 1987) 833 F.2d 335, 339 [266 App.D.C. 85], vacated *sub nom. Jenkins v. Jones* (1989) 490 U.S. 1001 [109 S.Ct. 1633, 104 L.Ed.2d 149], affd. as mod. *sub nom. Jones v. Jenkins* (D.C. Cir. 1989) 878 F.2d 1476 [279 App.D.C. 19] [drug testing implicates strong privacy interests as it may provide "periscope" into individual's behavior in

his home].) ██ The right to privacy "protects against unjustified intrusions on personal privacy. ' "[It] is the right to be left alone . . . . It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose . . . ." ' [Citation.]" (*Semore v. Pool, supra,* at p. 1096.) ██ Although Caltrans asserts that it does not intend to conduct off-duty drug testing, the possibility that it might do so foreshadows a significant intrusion on an employee's privacy at home. The intrusion is apparent. First, the random drug testing at issue here is in itself an intrusion on an individual's privacy rights, and that intrusion is significantly enhanced when an employee is subject to follow-up drug testing on his off-duty time. Second, Caltrans's employees have no reasonable expectation that they will be subject to off-duty follow-up drug testing on their personal time because Caltrans's written policies provide that employees will be subject to testing when they are on duty.[3] Finally, in order to justify off-duty drug testing, Caltrans was required to show that no less intrusive alternatives were available. (*Loder v. City of Glendale, supra,* at pp. 891, 897.) Caltrans failed to sustain its burden. Indeed, it failed to offer any explanation as to why follow-up drug testing could not occur during an employee's regular work hours.

Moreover, the injunction ordered by the trial court permits testing contiguous to an employee's on-duty time and permits off-duty follow-up drug testing if necessary to comply with federal regulations. These less intrusive alternatives permit Caltrans to conduct its follow-up drug testing while protecting against an unjustified intrusion into an employee's right to personal privacy. Under these circumstances, we cannot conclude that the trial court erred in issuing the injunction. (See *Bernardi v. City Council* (1997) 54 Cal.App.4th 426, 439 [63 Cal.Rptr.2d 347] [injunctive relief appropriate to prevent threatened action].)

### 3. *Attorney Fees*

██ Caltrans contends that the trial court abused its discretion in awarding attorney fees pursuant to the private attorney general statute (Code Civ. Proc., § 1021.5 (hereafter section 1021.5)) because the litigation did not confer a significant benefit on the general public and IUOE lacks the requisite financial burden to sustain the award. It also argues that a 1.5 multiplier was inappropriate. These contentions lack merit.

██ Section 1021.5 provides in relevant part that "a court may award attorneys' fees to a successful party against one or more opposing parties in

---

[3]The Caltrans Commercial Drivers License (CDL) Holders Handbook specifically provides that "[a] CDL holder is subject [to random follow-up] testing for: [¶] ● [c]ontrolled substances (drugs) anytime the CDL holder is on duty."

any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate . . . ." Whether the requirements of section 1021.5 are met is a question best decided by the trial court. (*Planned Parenthood v. Aakhus* (1993) 14 Cal.App.4th 162, 170 [17 Cal.Rptr.2d 510].) A trial court's award of fees under section 1021.5 "may not be disturbed on appeal absent a showing that the court abused its discretion . . . i.e., the record establishes there is no·reasonable basis for the award." (*Feminist Women's Health Center v. Blythe* (1995) 32 Cal.App.4th 1641, 1666 [39 Cal.Rptr.2d 189].)

Caltrans contends that the trial court erred in awarding fees because it based its finding that the general public would benefit from the litigation on the deterrent effect that the case might have on other state agencies considering drug testing. Relying on *Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629 [71 Cal.Rptr.2d 632], it argues that reliance on the deterrent effect of litigation would result in an award of fees in every action in which a public agency has been successfully sued for some wrongful conduct. In *Flannery*, the court declined to award fees under section 1021.5 to a plaintiff in a sex discrimination case, reasoning that the primary effect of the lawsuit was the vindication of the plaintiff's own personal right and economic interest. (*Flannery, supra*, at pp. 636-637.) Here, however, unlike *Flannery*, IUOE's action helped to preserve the privacy rights of employees subject to drug testing, a significant public benefit that was not simply incidental to IUOE's own stake in the litigation. As the trial court noted at the hearing on the issue, the case benefited all employees in the state who might be subject to drug testing. In sum, the requirement of a substantial benefit to the public was met in this case.

Caltrans also urges that the financial burden element of section 1021.5 was not met here because IUOE brought the litigation to benefit its own members. That element "requires that the cost of the litigation to plaintiff be disproportionate to plaintiff's individual stake in the outcome. [Citation.] This criterion is met when the cost of the claimant's legal victory transcends his personal interest in the subject of the suit." (*Planned Parenthood v. Aakhus, supra*, 14 Cal.App.4th at pp. 172-173.)

There is no question that the financial burden of the litigation was disproportionate to IUOE's interest in the litigation. Neither IUOE nor any of its members secured any pecuniary benefit from the case. Rather, the litigation enforced the privacy rights of employees to be free from off-duty

drug testing thus necessarily conferring a significant benefit on the public as a whole. The trial court justifiably found that this element was established and that an award of fees was appropriate.

Finally, Caltrans asserts that the trial court erred in imposing a 1.5 multiplier. The trial court's award was proper.

In determining an attorney fee award, the trial court must first set the "lodestar" figure based on a careful compilation of the reasonable hourly compensation of each attorney or legal professional involved in the case. (*Serrano v. Priest* (1977) 20 Cal.3d 25, 48 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*); *Serrano v. Unruh* (1982) 32 Cal.3d 621, 643 [186 Cal.Rptr. 754, 652 P.2d 985].) Once the lodestar amount is determined, the court may consider a variety of other factors justifying augmentation or reduction of the award. (*Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 322 [193 Cal.Rptr. 900, 667 P.2d 704].) These factors include: "(1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award; (4) the fact that an award against the state would ultimately fall upon the taxpayers; (5) the fact that the attorneys in question received public and charitable funding for the purpose of bringing law suits of the character here involved; (6) the fact that the monies awarded would inure not to the individual benefit of the attorneys involved but the organizations by which they are employed . . . ." (*Serrano III, supra*, at p. 49, fn. omitted.)

The trial court found that a multiplier was justified given "the novelty and difficulty of the issues involved, the skill displayed by plaintiff's counsel in overcoming the intransigent opposition of defendant Caltrans, the excellent results achieved by plaintiffs, and the importance of the privacy rights that were vindicated by the Injunction." These *Serrano III* factors support the trial court's application of a multiplier. In particular, the fact that Caltrans continued to oppose this litigation even though IUOE offered to settle the case if Caltrans would follow its policy to test employees only while on duty supports application of the multiplier. (See *Kern River Public Access Com. v. City of Bakersfield* (1985) 170 Cal.App.3d 1205, 1228-1229 [217 Cal.Rptr. 125] [lodestar amount increased in complex case where success uncertain and defendant fought the case on every point].)

In addition to the attorney fees properly awarded below, IUOE is entitled to the fees incurred in defending this appeal. (*Serrano v. Unruh, supra*, 32

Cal.3d at p. 639; *Schmid v. Lovette* (1984) 154 Cal.App.3d 466, 479-480 [201 Cal.Rptr. 424].)

## Disposition

The judgments are affirmed. The matter is remanded to the trial court for a determination of the amount of attorney fees to be awarded IUOE on this appeal.

Poché, J., and Reardon, J., concurred.

A petition for a rehearing was denied October 30, 2000, and the petition of real party in interest for review by the Supreme Court was denied December 20, 2000. Baxter, J., and Chin, J., were of the opinion that the petition should be granted.