Filed 10/14/15  Storm v. Rite Aid Corp. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JEFFREY ALLEN STORM, JR., | B254328 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC419584) |
| RITE AID CORPORATION, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Michael L. Stern.  Affirmed.

Shegerian & Associates, Inc., Carney R. Shegerian, Anthony Nguyen and Jill McDonell for Plaintiff and Appellant.

Kading Briggs, Glenn L. Briggs, Theresa A. Kading, Beth C. Kearney and Sharon B. Kearney for Defendant and Respondent.

Jeffrey Allen Storm, Jr. (appellant) appeals from a judgment following a jury trial on his claim of wrongful termination in violation of public policy against Rite Aid Corporation (respondent). The jury found that appellant's employment was wrongfully terminated and returned a verdict in favor of appellant, awarding him $113,000 for past economic damages. The jury awarded appellant $0 for future economic damages, and $0 for past and future noneconomic damages. Appellant moved for a new trial on the ground that the noneconomic damage and future economic damage awards were inadequate as a matter of law. The trial court denied the motion. In addition, the trial court denied appellant's motion for attorney fees under Code of Civil Procedure section 1021.5

Appellant appeals the trial court's denial of his motions for new trial and for attorney fees. Finding no error in the trial court's decisions on these motions, we affirm.

## FACTUAL BACKGROUND[1]

### Appellant's employment

Respondent hired appellant to work as a security officer in its Lancaster distribution center in August 2001. About a year and a half later, appellant was promoted to the position of undercover detective. In 2005, appellant was promoted to district loss prevention manager, and in 2007, he retained that position in the area of Southern California covering Santa Monica to downtown Los Angeles. Appellant remained in the position of loss prevention manager until his termination in June 2009.

Appellant's responsibilities as a loss prevention manager included performing internal investigations of other employees of respondent. The majority of these investigations involved theft or fraud. Appellant testified that he normally did not investigate timecard fraud or time clock fraud, but that he had been involved in investigating such fraud "a couple of times." Appellant's regular job duties included

---

[1]    These background facts are taken largely from our prior nonpublished opinion in this matter, *Storm v. Thrifty Payless* (Dec. 1, 2011, B228091) (*Storm I*). We grant appellant's request to take judicial notice of this prior nonpublished opinion pursuant to Evidence Code section 452, subdivision (d).

checking to see if there were outdated products on the shelves in respondent's stores, pulling such items off the shelves, and ensuring that the products were properly processed out of the system.

Appellant's supervisor at the time of his termination was Dexter Mason (Mason). Mason described appellant as "always prompt and professional," and stated that appellant had saved respondent more than $2 million through his dedication as a district loss prevention manager.

**The two relevant investigations**

*Outdated food items*

In late April 2009, appellant was training two new district managers on internal control issues at respondent's Westwood store. Appellant was showing the two new employees how to use a "SMT," or shrink management tool. As part of the process, they were required to determine if there was any outdated product on the shelves. Appellant found approximately 20-25 items with expired dates, including chips, "Lunchables," and milk. Appellant had, in the past, found one or two items with expired dates while performing SMTs in other stores, but never to the extent that he discovered at the Westwood store.

Following normal protocol, appellant pulled the items off the shelf and instructed the store manager, Christi Cuara (Cuara), to process them. This meant that the items would be taken out of the system for inventory purposes. Appellant reported his findings to Mason. He also reported the incident to his district manager, David Baca (Baca). Baca's response was, "What a fuckin' idiot" and "This is going to be a problem now" and then hung up the phone. Baca never followed up with appellant regarding the outdates.

Respondent was, at the time of his discovery, under indictment by the State of California for selling "outdates," or expired items.

Cuara testified that appellant was very upset when he discovered the outdated items in her store. Appellant yelled at her and threw outdated merchandise at another associate.

*Timecard fraud*

In April 2009, appellant spoke with a couple of employees from respondent's Culver City store. Those employees had informed appellant that they felt they had occasionally been shorted on their pay. The specific allegation was that Cuara (who had been in the Culver City store before the Westwood store) was removing overtime from employee timecards. Appellant passed on the information to Roger Ceballos (Ceballos) in respondent's human resources department.

**Cuara's claim regarding inappropriate text messages**

Shortly after appellant interviewed Cuara about the timecard irregularities, Cuara reported to respondent that appellant had sent her inappropriate text messages in the past. The text messages included a cartoon image of a male masturbating and a man having intercourse with a woman on a donkey. Cuara admitted that her conversations with appellant about timecard fraud and outdated products motivated her to report appellant to human resources because she felt that she was being targeted. When interviewed by Ceballos, appellant denied sending the text messages and accused Cuara of making false allegations in retaliation for appellant's investigation of Cuara for timecard fraud. Appellant prepared a written statement in which he denied sending inappropriate text messages to Cuara or anyone else.

Ceballos received the report from Cuara on June 9, 2009. Two days later, Cuara showed Ceballos the text messages on her cellular telephone. The messages appeared to have been sent to her from appellant's cell phone number. Ceballos personally reviewed the text messages and confirmed that they appeared in every respect to have been sent from appellant's cell phone, based on the fact that the sender's telephone number was appellant's cell phone number.

After Ceballos's meeting with appellant, Mason reported to Ceballos that appellant had also sent him sexually explicit text messages, including at least one of the same ones that Cuara had reported receiving.

4

**Appellant's termination**

On June 26, 2009, Ceballos met with appellant again, this time with Mason present. Appellant was informed that his employment was terminated for sending inappropriate text messages, and "for being less than truthful about it."

## PROCEDURAL HISTORY

**Complaint and summary judgment proceedings**

Appellant's complaint, filed on August 11, 2009, alleged causes of action for: (1) wrongful termination of employment in violation of public policy for internal reporting of illegal failure to pay wages; (2) wrongful termination of employment in violation of public policy pursuant to Labor Code section 1102.5, subdivision (b); (3) intentional infliction of emotional distress; (4) breach of express and implied-in-fact contracts not to terminate employment without good cause; and (5) defamation and compelled self-defamation.

On May 28, 2010, respondent filed a motion for summary judgment. On September 10, 2010, the trial court granted respondent's motion in full. (*Storm I*, at pp. *8-9.) Appellant appealed to this court. In *Storm I*, we affirmed the trial court's grant of summary judgment as to appellant's second, third, fourth and fifth causes of action, but reversed and remanded for further proceedings on appellant's first cause of action for wrongful termination of employment in violation of public policy. The issue of attorney fees was not before this court in the prior appeal, and we specified that each side was to bear its own costs in that appeal. (*Storm I*, at p. *28.)

**Respondent's section 998 offer to appellant**

On January 3, 2013, respondent served an offer to compromise pursuant to Code of Civil Procedure section 998 for $252,587 plus interest and reasonable and recoverable costs, which appellant rejected.

**The November 2013 trial on appellant's claim for wrongful termination in violation of public policy**

The matter proceeded to trial from November 4, 2013 through November 14, 2013. The sole claim at issue was appellant's claim for wrongful termination in violation

5

of public policy. The following is a brief summary of the testimony at trial on the topics relevant to this appeal.

### Testimony regarding emotional distress

Appellant sought damages at trial for emotional distress that he suffered as a result of the termination of his employment. He testified that he suffered from anxiety attacks countless times since he was fired. In addition, he testified that although he had lost weight during his employment with respondent, after his termination he gained significant weight and weighed somewhere between 300 and 325 pounds. However, at the time of trial he had again lost weight and weighed around 225.[2] Appellant testified that he was sometimes affected by depression.

Appellant admitted on cross-examination that he did not see any doctors to treat his alleged emotional distress until 10 months after his termination, when he was referred to a doctor by his attorney. That doctor did not testify at trial. Appellant also admitted that he never took any type of medication.

Appellant testified that he got a new job six months after his termination and had been working full time since then.

Appellant relied heavily on the testimony of an expert witness, Dr. Anthony Reading, to convince the jury of his emotional distress damages. Dr. Reading did not examine appellant until three and a half years after his discharge from respondent. Dr. Reading testified that he examined appellant twice in 2013, and that both times appellant "fulfilled criteria for major depression." Dr. Reading further testified that the termination of appellant's employment "stands out as the precipitating stressor." Dr. Reading listed appellant's symptoms as very, very depressed, with an inability to derive pleasure and no motivation. Appellant had trouble with his self-worth and difficulties with sleep, even thoughts of death. Dr. Reading described appellant as non-communicative, socially avoidant, with a lack of sexual appetite and intrusive, upsetting thoughts. Dr. Reading

---

[2]     Appellant's fiancé and father also testified that the termination of appellant's employment caused him to gain significant weight.

stated that appellant was embarrassed about what happened, and had suffered a fracture of trust. Additionally, appellant suffered from anxiety and worry about the future.

Appellant was administered an exam for depression. It revealed that appellant was at significant risk for suicide. However, Dr. Reading testified that he was not concerned about that examination result. He indicated that, having explored the topic with appellant individually, he had concluded that appellant's risk for suicide was mild. Dr. Reading stated that it would be below the standard of care for any psychologist to rely solely on psychological testing without a separate evaluation of the individual's risk to himself.

Dr. Reading also administered the MMPI-2-RF test to appellant in December 2012. He stated that this test could be described as a gold standard for this kind of psychological testing. There are two main objectives to the test: (1) to explore whether or not there is any behavior going on that would affect the validity of the test, such as over-reporting or exaggeration of symptoms; and (2) once you get past the validity part of the test, to receive a number scorecard regarding the patient's emotional state. In the case of appellant, the test came back invalid. Dr. Reading testified that the most likely explanation for the invalidity of the test was that appellant was over-reporting his symptoms.

Dr. Reading administered the same test in April of 2013. This time the test did not come back per se invalid. However, appellant tested in the 88th percentile, which is in the top 12 percent of 500 men in a control group who were not working due to psychiatric reasons. Dr. Reading admitted that when he met with appellant, appellant arrived on time, was well groomed, answered questions directly and appropriately, made eye contact, and reported that he goes to work every day.

Dr. Reading testified that although appellant's brother committed suicide in 2005, appellant had coped with that event and recovered from it. In addition, approximately 20 years before trial, appellant had witnessed a home invasion in which his parents were shot (but survived). Dr. Reading described this event as "a distant issue that he resolved." In Dr. Reading's opinion, the shooting was an event from which appellant made an emotional and psychological recovery. Despite recovering from these two

7

significant events, Dr. Reading's opinion was that appellant had not recovered from the termination of his employment as of the time that Dr. Reading met with him in 2012 and 2013.

Appellant's father testified that his son looked "sullen" and "just real sad all the time." After appellant's employment was terminated, he canceled many of their plans and became isolated. Appellant's fiancé also testified that appellant appeared sad and worried, kept to himself, and didn't want to talk to anyone or play with the kids. She stated that the termination of appellant's employment ended their relationship.

### Testimony regarding future economic loss

In December of 2009, approximately six months after his termination from respondent, appellant got a full time job at Lowe's. At the time of trial, appellant remained employed by Lowe's.

Appellant's evidence regarding his future economic loss came from his expert witness, forensic economist Tamorah Hunt (Hunt). Hunt reviewed records showing what appellant's pay was during his last years at respondent, and what his earnings were during the years he spent at Lowe's. Hunt prepared a calculation of appellant's past economic loss and a calculation of appellant's future economic loss. The past loss reflected the loss between the date of termination and approximately one month before trial. The future loss reflected the loss for the remainder of appellant's work life until age 64.3.

Hunt calculated that between the last full year that he worked at respondent, and the first full year that he worked at Lowe's, appellant's salary declined by about 27 percent. Hunt calculated that appellant's past economic loss was $113,640 if he remained in his position as district loss prevention manager, and $179,907 if he had been promoted to director of loss prevention in January 2012. Hunt projected appellant's future economic losses by calculating the difference between appellant's projected earnings at respondent, and then subtracting out the pay at Lowe's during the same time frame. The present value of the future loss came out to $426,680 assuming appellant would retain the same position he was in when he was fired. Hunt's second calculation

8

assumed that appellant would have been promoted if he continued working at respondent, and placed the loss at $1,321,991.

In making her calculations, Hunt assumed that appellant would not get any type of promotion at Lowe's during his career. Shortly after Hunt testified, appellant admitted that recently he had been promoted to assistant store manager at Lowe's, which included a $5,000 per year pay increase.

### *The verdict*

After deliberations, the jury awarded appellant $113,000 for past economic damages, $0.00 for future economic damages, and $0.00 for past and future noneconomic damages. Judgment was filed on November 18, 2013.

## Appellant's motion for a new trial

On December 12, 2013, appellant filed a motion for new trial pursuant to Code of Civil Procedure 657 on the grounds that the noneconomic damages and future economic damages awarded by the jury were inadequate as a matter of law. Appellant argued that the undisputed evidence showed that he suffered emotional distress, and that it would be an abuse of discretion to deny a new trial on damages when appellant's emotional distress damages could not be zero. Appellant also argued that the jury award of $0 future economic damages was also inadequate as a matter of law because it was undisputed at trial that appellant earns less than he did at respondent.

Respondent opposed appellant's motion. Respondent argued that the jury verdict should not be overturned, and that the jury was not required to believe appellant's evidence.

On January 10, 2014, the trial court denied appellant's motion for new trial.

On February 7, 2014, appellant filed a notice of appeal from the trial court judgment dated November 18, 2013, and the order denying appellant's motion for new trial dated January 10, 2014.

## Appellant's motion for attorney fees

On December 18, 2013, appellant filed a motion for attorney fees of $785,927.50, plus a lodestar multiplier of 2.0, for a total amount of $1,571,855 pursuant to Code of

9

Civil Procedure section 1021.5.  Appellant argued that enforcement of food safety laws, as well as wage laws, are important rights affecting the public interest.  Appellant argued that the litigation benefited the public at large and the lawsuit was necessary to enforce the rights at issue.

Respondent opposed the motion, arguing that it is settled law in California that attorney fees are not recoverable on a claim for wrongful termination in violation of public policy.

The matter was heard on February 11, 2014, and the court took it under submission.  On July 21, 2014, the court filed an order denying the motion.  The court concluded that appellant was not entitled to recover attorney fees under Code of Civil Procedure section 1021.5.

On August 7, 2014, appellant filed his notice of appeal from the trial court's July 21, 2014 order regarding the motion for attorney fees.

**Consolidation**

Having considered the parties' stipulation to consolidate the two appeals, on August 28, 2014, this court ordered that the appeals be consolidated.

**DISCUSSION**

**I.  Motion for new trial**

*A.  Standard of review*

The denial of a request for new trial on the basis of inadequate damages is reviewed for an abuse of discretion.  (*Dodson v. J. Pacific, Inc.* (2007) 154 Cal.App.4th 931, 938.)  The proper amount of damages is a question of fact for the jury.  (*Gersick v. Shilling* (1950) 97 Cal.App.2d 641, 645.)  Upon a motion for new trial contending that the damages are too high or too low, the determination rests within the discretion of the trial court.  The appellate court has no power to pass upon the credibility of witnesses, and may only interfere where the facts suggest passion, prejudice or corruption on the part of the jury, or where the uncontradicted evidence demonstrates that the award is insufficient as a matter of law.  (*Ibid.*)

"[A]lthough the trial court's determination is not binding upon a reviewing court, it is to be accorded great weight because having been present at the trial the trial judge was necessarily more familiar with the evidence. [Citations.]" (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 64.) The appellate court "must start with the presumption that the record contains evidence sufficient to support the judgment; it is appellant's burden to demonstrate otherwise. [Citation.]" (*Baxter Healthcare Corp. v. Denton* (2004) 120 Cal.App.4th 333, 368.) In determining whether there has been an abuse of discretion, "the facts on the issue of damage most favorable to the respondent must be considered." (*Gersick v. Shilling, supra,* 97 Cal.App.2d at p. 645.)

## B. *Emotional distress damages*

Appellant argues that there is a long history of holding damages awards that fail to compensate for pain and suffering inadequate as a matter of law. Appellant string cites cases to support this contention. However, the cases that appellant cites are personal injury cases where the plaintiff suffered severe physical injury and physical pain and suffering. (See *Capelouto v. Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889 [reversing and remanding matter where jury was precluded from awarding damages for pain and suffering where infant suffered vomiting, diarrhea, dehydration, cramps and shock following infection contracted at hospital]; *Clifford v. Ruocco* (1952) 39 Cal.2d 327 [reversing judgment of inadequate damages where plaintiff suffered a scalp laceration, bruises to her side and leg, an infection in her leg, adhesions requiring surgery, pain and swelling in the leg, and was required to spend 24 days in the hospital]; *Haskins v. Holmes* (1967) 252 Cal.App.2d 580 [$88.63 for general damages insufficient in case of assault resulting in fractures to cheek and jaw requiring surgery]; *Buniger v. Buniger* (1967) 249 Cal.App.2d 50 [general damages so small as to warrant reversal in case where 63-year-old woman suffered a broken hip, required insertion of a prosthesis, and could not return to normal activities]; *Gallentine v. Richardson* (1967) 248 Cal.App.2d 152 [damages found to be inadequate where plaintiff was negligently shot in the leg on a hunting trip and substantial general damages were incurred]; *Chinnis v. Pomona Pump Co.* (1940) 36 Cal.App.2d 633, 642-643 [damages of $750 for each child involved in

11

automobile collision were inadequate as a matter of law where one child suffered multiple fractures, permanent disfigurement of her face, brain damage, and internal injuries and the other child suffered permanent deformity of her left foot and inward bowing of her left leg]; *Bencich v. Market S. R. Co.* (1937) 20 Cal.App.2d 518 [pain and suffering damages inadequate where plaintiff suffered a crushed right foot, spent six months in the hospital, and became permanently disabled due to amputation resulting from collision between fire truck and street car]; *Dodson v. J. Pacific, Inc., supra*, 154 Cal.App.4th 931 [jury award of zero noneconomic damages resulting from injury when metal cylinder weighing between four and five thousand pounds fell off truck insufficient as a matter of law where the jury expressly found defendant liable and plaintiff suffered back injury requiring surgery].) None of the cited cases involves alleged mental or emotional damages resulting from a job termination. Thus, none of the cases stand for the proposition that a damage award of $0 in this case was unlawful. Appellant has not cited any wrongful termination cases where a motion for new trial was granted on the grounds that the jury's award of emotional suffering damages was inadequate.

Appellant argues that his evidence of severe emotional distress was substantial and undisputed. Appellant's characterization of the evidence as undisputed is inaccurate. The record shows that respondent's counsel vigorously cross-examined appellant's key witness, Dr. Reading, regarding appellant's alleged emotional damages. Respondents brought out weaknesses in Dr. Reading's testimony. For example, Dr. Reading did not examine appellant until three and a half years after his discharge from respondent. Further, the first examination of appellant's mental health yielded invalid results, and Dr. Reading admitted it was likely because appellant was over-reporting, or exaggerating, his alleged symptoms of emotional damage. While the second test revealed that appellant was supposedly more depressed than 88 percent of men who were not working due to mental health, the evidence was that appellant had never missed a day of work. This undermined appellant's evidence of emotional damage. The jury was entitled to disbelieve appellant's evidence.

12

In addition, there were other significant events in appellant's history which could have led to depression or anxiety. Appellant witnessed his parents get shot in a home intrusion. In addition, appellant's brother had committed suicide. The jury could easily have determined that appellant's mental state was attributable to these traumatic events rather than his termination from employment.

The jury instructions made it clear to the jury that they were entitled to believe all, part, or none of a witness's testimony. In addition, the jury could decide whether or not to believe an expert's testimony. Respondent's cross-examination of appellant's witnesses put their testimony in question. Appellant's evidence cannot be described as undisputed or uncontradicted. On the contrary, it was hotly disputed, and the question of whether appellant was entitled to damages was a question of fact for the jury. (*Gersick v. Shilling, supra*, 97 Cal.App.2d 645.) Viewing the record in the light most favorable to the respondent, as we must, we find that the evidence supports the decision. (*Ibid.*)

We must give great weight to the trial court's decision denying appellant's motion for new trial. (*Bertero v. National General Corp., supra*, 13 Cal.3d at p. 64.) Given the evidence that was before the jury on emotional distress damages, we find that no abuse of discretion occurred.

### C. Future economic loss damages

Appellant's motion also requested a new trial because the jury awarded appellant $0 for future economic loss.

A plaintiff "has the burden of proving, with reasonable certainty, the damages actually sustained by him as a result of the defendant's wrongful act." (*Chaparkas v. Webb* (1960) 178 Cal.App.2d 257, 259.) Thus, appellant first had the burden to prove, with reasonable certainty, the amount of his future economic loss. In addition, employees faced with a wrongful discharge have a legal duty to mitigate damages while pursuing remedies against their former employer. (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 871 (*Mize-Kurzman*).) While a wrongfully discharged employee has a duty to mitigate his damages, he is not required to seek employment "of a different or inferior kind." (*Parker v. Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d

176, 182.) It is the employer's duty to affirmatively prove failure to mitigate as an affirmative defense. (*Mize-Kurzman*, at p. 871.)

Appellant argues that the evidence was undisputed that appellant's new job with Lowe's was not comparable or substantially similar to his job with respondent, and in fact, it was inferior. He had less authority and earned less than he did at respondent. In short, his new position was the equivalent of a demotion to one of the first few positions he held with respondent. Appellant's projected future economic loss was between $426,680 and $1,321,991. Appellant argues that this evidence was undisputed, and respondent failed to present any evidence contradicting appellant's claim for future economic loss. Appellant argues that respondent thus failed to meet its burden to show that appellant's current position is comparable or substantially similar to his previous position in respondent's employ. (*Martin v. Santa Clara Unified School Dist.* (2002) 102 Cal.App.4th 241, 255.)

Respondent suggests that it was appellant's evidence which resulted in a failure of proof. Respondent points out that appellant's expert testimony and projection of future lost wages were based on an assumption that appellant would never be promoted at Lowe's. However, when appellant took the stand, he admitted that he had already been promoted and was already earning $5,000 more annually than what was presented in Hunt's calculation of future lost income. In addition, respondent points out, appellant provided no evidence of his current income. He provided no pay stubs or W-2 forms from Lowe's, nor did he testify to his rate of pay. He only testified that he had recently obtained a promotion for about $5,000. Thus, respondent argues, appellant did not provide uncontested evidence of future lost wages, and he did not present a calculation of damages that were reasonably certain.

Again, we must analyze the jury's verdict to determine whether it is supported by substantial evidence. In doing so, we must view the evidence in the light most favorable to the respondent. (*Gersick v. Shilling, supra*, 97 Cal.App.2d at p. 645). First, we note that the jury was not required to believe appellant's expert testimony regarding future lost wages. The jury was specifically instructed that it was not required to believe the

14

testimony of any expert witness. And while appellant's expert witness provided a calculation of lost future damages, that calculation was undermined by appellant himself, who testified that he had recently received a raise. Appellant's expert did not consider the possibility that appellant might receive a raise. This rendered her calculation inaccurate.

In addition, the jury may have concluded that appellant's current employment was substantially similar to his position at Rite Aid. In both positions, he worked in the area of loss prevention. While his responsibilities appeared to have been greater at Rite Aid, the evidence at trial was that appellant was an outstanding employee and never missed work. Under the circumstances, the jury could have assumed that appellant would continue to receive promotions and pay raises at Lowe's, thus rendering appellant's expert's projections even more off the mark.

*Goehring v. Chapman University* (2004) 121 Cal.App.4th 353 (*Goehring*) is instructive. In *Goehring*, three law students sued a law school for fraud and various statutory violations stemming from the school's failure to make disclosures regarding its accreditation status. (*Id.* at p. 358.) After a lengthy trial, the jury found that the school knowingly and recklessly made false representations to the plaintiffs. (*Id.* at p. 362.) However, it found that plaintiff Yeomans had not satisfied the damages element of her fraud claim. Yeomans's expert calculated that the year's delay in graduating that Yeomans experienced caused her damages of between $129,695 and $321,014 based on the assumption that Yeomans would pass the bar on her first try. However, Yeomans testified that she failed the bar on her first two attempts, and at the time of trial had not yet passed. The Court of Appeal affirmed the jury's award of no damages, finding that the expert's testimony could not constitute substantial evidence when it was based upon assumptions not supported by evidence in the record. (*Id.* at pp. 367-368.) Similarly, here, where the expert's testimony was based on assumptions not supported by the evidence at trial, the jury was justified in rejecting it.

Appellant cites no case law which instructs that a new trial is mandated on the issue of lost future income under the circumstances before us. Appellant cites *Price v.*

15

*McComish* (1937) 22 Cal.App.2d 92, which involved a "wanton physical attack" made by the defendant on the plaintiff (*id.* at p. 93), resulting in the plaintiff spending three months in a cast and being confined to bed for four months. The plaintiff provided evidence of his hospital bill, his X-rays, the doctors' fees, and the services of a nurse for eight weeks, among other expenses. (*Id.* at p. 94.) The Court of Appeal determined that the award of $200 represented nothing more than a small fraction of the damages sustained by plaintiff, and reversed and remanded for a new trial on damages. (*Id.* at pp. 95-98.) The case does not suggest that we are required to reverse and remand here, where evidence of damages for future economic loss was not reliable.

*Torr v. United Railroads of San Francisco* (1921) 187 Cal.505 (*Torr*), involved an action for negligence against a street car operator and physical injuries resulting from an accident. The trial court found that the plaintiff suffered no economic damages for past lost wages. The Court of Appeal found that the evidence did not support this conclusion, based on the plaintiff's testimony that she was unable to engage in her profession for long periods of time and that during the five years preceding the trial she had lost five thousand dollars due to her inability to work. (*Id.* at p. 508.) In contrast, the future economic damages at issue in the matter before us were uncertain. This is especially true given that appellant was employed full time at the time of trial and had recently received a promotion. Unlike the plaintiff in *Torr*, there was evidence that appellant had never missed a day of work. *Torr* does not mandate a finding of future economic loss in this case.

*Donnatin v. Union Hardware & Metal Co.* (1918) 38 Cal.App. 8, involved injuries sustained in an automobile accident. The jury found the defendant liable for negligence but fixed the damages at one dollar. (*Id.* at pp. 9-10.) Based on the verdict of liability, the Court of Appeal found the damages grossly inadequate, but speculated that the trial court denied the motion for new trial on damages because it did not believe the defendant guilty of negligence. Under the circumstances the Court of Appeal found no abuse of discretion in the trial court's ruling. (*Id.* at pp. 11-12.) Similarly, in *Frampton v. Stoloff* (1956) 142 Cal.App.2d 175, the Court of Appeal declined to reverse an award of $200 for

16

injuries sustained in an automobile accident where there was evidence that the plaintiff's physical problems had predated the accident and were not necessarily attributable to the accident. (*Id.* at pp. 178-179.)

Finally, in *Clifford v. Ruocco, supra*, 39 Cal.2d 327, a new trial was granted regarding injuries resulting from an automobile accident where the damages awarded were less than plaintiff's undisputed special damages and loss of earnings. The matter did not concern speculative lost future earnings, and does not convince us that reversal is warranted in this matter.

Appellant has failed to convince us that any error occurred. We find no abuse of discretion in the trial court's denial of the motion for new trial on future economic damages.

## II. Motion for attorney fees

Appellant's final argument is that the trial court erred in declining to award appellant attorney fees under Code of Civil Procedure section 1021.5 (section 1021.5).

### A. Standard of review

The parties agree that the standard of review for an order granting or denying attorney fees under section 1021.5 is abuse of discretion. (*Baggett v. Gates* (1982) 32 Cal.3d 128, 142-143). This standard is highly deferential. (*Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 355).

### B. Section 1021.5

Section 1021.5 provides, in part:

> Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

17

Section 1021.5 allows for the recovery of attorney fees for a suit enforcing a public policy that benefits a public interest. The statute arises from the recognition that "privately initiated lawsuits are often essential to the effectuation of fundamental public policies." (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 933 (*Woodland Hills*).) "[W]ithout some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible. [Citations.]" (*Ibid.*) The purpose of an award of attorney fees pursuant to section 1021.5 "is to encourage suits that enforce 'common interests of significant societal importance, but which do not involve any individual's financial interest to the extent necessary to encourage private litigation to enforce the right. [Citation.]'" (*Satrap v. Pacific Gas & Electric Co.* (1996) 42 Cal.App.4th 72, 77 (*Satrap*).) "Section 1021.5 was not designed as a method for rewarding litigants motivated by their own pecuniary interests who only coincidentally protect the public interest." (*Beach Colony II v. California Coastal Com.* (1985) 166 Cal.App.3d 106, 114.) In addition, section 1021.5 is not intended "to provide insurance for litigants and counsel who misjudge the value of their case, and vigorously pursue litigation in the expectation of recovering substantial damages, and then find that the jury's actual verdict is not commensurate with their expenditure of time and resources." (*Satrap, supra,* 42 Cal.App.4th at pp. 79-80.)

Where the primary effect of a lawsuit is the vindication of the plaintiff's own personal right and economic interest, a fee award is improper under section 1021.5. (*Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 637 (*Flannery*) [attorney fee award under section 1021.5 inappropriate in lawsuit involving claim of harassment and wrongful termination]; see also *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1169-1177 (*Weeks*) [claim of sexual harassment under Fair Employment and Housing Act was brought as a means of vindicating plaintiff's own personal rights and economic interest, not to benefit the public, therefore award of fees under section 1021.5 inappropriate].)

18

*C. The trial court did not abuse its discretion in denying attorney fees under section 1021.5*

The trial court must look at the factors set forth in section 1021.5 and determine whether a fee-shifting award is warranted. As set forth above, this determination is directed to the sound discretion of the trial court. (*Satrap, supra,* 42 Cal.App.4th at p. 77.) In this case, the trial court determined that a significant benefit had not been conferred on the public in this case, and thus the first factor of section 1021.5 had not been met:

> "The plaintiff's action did not result in the enforcement of an important right affecting the public interest. There is no showing of any public impact of his lawsuit. The only person to directly benefit from litigating plaintiff's causes of action in this case was plaintiff himself. Plaintiff's reports to his employer were part of his job. The lawsuit was not brought to rectify defendant's lax product safety; it was for plaintiff's wrongful employment discharge."

*Flannery* supports the trial court's decision. In *Flannery*, the plaintiff sued her former employer, California Highway Patrol, for harassment and wrongful termination in violation of the FEHA because of gender based discrimination. After a lengthy trial, the jury returned a verdict in the plaintiff's favor for $250,000. The trial court found that the plaintiff was entitled to attorney fees under section 1021.5. On appeal, the trial court's decision regarding attorney fees under section 1021.5 was reversed. The Court of Appeal noted, "[w]hen the record indicates that the primary effect of a lawsuit was to advance or vindicate a plaintiff's personal economic interests, an award of fees under section 1021.5 is improper. [Citations.]" (*Flannery, supra*, 61 Cal.App.4th at p. 635.) The appellate court concluded, "[w]hile plaintiff's lawsuit was based on the important right to be free from unlawful discrimination, its primary effect was the vindication of her own personal right and economic interest." (*Id.* at p. 637.) (See also *Weeks, supra*, 63 Cal.App.4th at pp. 1170-1171 [same]).

The cases cited by appellant are distinguishable. In *Edgerton v. State Personnel Bd.* (2000) 83 Cal.App.4th 1350 (*Edgerton*), a state agency terminated an employee

(Edgerton) based on a positive drug test. The State Personnel Board upheld the dismissal. Edgerton and the International Union of Operating Engineers (IUOE) filed a combined petition for writ of administrative mandamus. The superior court granted the petition, finding that the Board's decision denied Edgerton a fair hearing. The court found that the Board's decision was not supported by substantial evidence due to issues with the chain of custody of Edgerton's urine specimen, and that the Board abused its discretion by excluding evidence that the drug testing was in violation of policy. (*Id.* at p. 1355.) The motion for summary judgment filed by IUOE was granted on the grounds that off-duty drug testing was a violation of employees' privacy interests and countervailing interests could be achieved by less intrusive means. The superior court issued an injunction prohibiting the agency from conducting off-duty drug testing unless necessary to comply with federal regulations. (*Ibid.*)

The superior court granted IUOE's motion for attorney fees under section 1021.5, but denied Edgerton's. (*Edgerton, supra*, 83 Cal.App.4th at pp. 1355-1356.) On appeal, the appellate court affirmed, noting that IUOE's action helped to preserve the privacy rights of employees and benefited all employees in the state who might be subject to drug testing. (*Id.* at p. 1362.)

Thus, in *Edgerton*, in contrast to the matter before us, the attorney fees were awarded to the union which litigated on behalf of all employees, and successfully obtained an injunction preventing the agency from conducting such drug testing in the future. The individual plaintiff, who litigated in order to vindicate his own personal economic interest, was not granted attorney fees. *Edgerton* thus supports the trial court's decision in this matter.

*Baggett v. Gates* (1982) 32 Cal.3d 128 (*Baggett*), also cited by appellant, is similarly distinguishable. In *Baggett*, police officers petitioned the trial court for a writ of mandate after they had been reassigned to lower paying positions pursuant to departmental findings that their job performance had been unsatisfactory. The writ was granted, permanently enjoining the police department from transferring or reassigning officers to lower pay grades without first affording them an opportunity for

administrative appeal.  (*Id.* at pp. 133-134.)  The plaintiffs' motion for attorney fees under section 1021.5 was denied, and this decision was appealed.

The Supreme Court determined that the trial court abused its discretion in denying attorney fees.  "Plaintiffs' action resulted in securing for themselves and many others the basic rights and protections of the Bill of Rights Act."  (*Baggett, supra*, 32 Cal.3d at p. 143.)  Further, the plaintiffs' "newly won right to an administrative appeal of the Department's decision to reassign them to lower paying positions will not necessarily result in the reversal of that decision."  (*Ibid.*)  Thus, personal vindication was not sought or achieved by the officers.  In contrast, appellant here sought such personal economic vindication.

In *Ligon v. State Personnel Bd.* (1981) 123 Cal.App.3d 583 (*Ligon*), a state employee whose applications for two higher positions with the Public Utility Commission were rejected petitioned in superior court for a declaration invalidating a policy relied on by the board in rejecting her applications.  The employee did not have the appropriate experience, and sought to have her "out-of-class" experience certified as minimum qualification for advancement.  (*Id.* at p. 586.)  The Court of Appeal found that the policy was a regulation that was not promulgated by the Board in substantial compliance with the requirements of the Administrative Procedure Act, and therefore declared it invalid.  (*Id.* at p. 588.)  However, the employee lost her bid to have her out-of-class experience considered for the position.  (*Id.* at p. 592.)

Concluding that an important right was implicated by the portion of the judgment declaring the board's policy invalid, the appellate court directed the trial court to grant the employee reasonable attorney fees pursuant to section 1021.5.  (*Ligon, supra*, 123 Cal.App.3d at p. 592.)

In *Ligon*, as in *Baggett* and *Edgerton*, the plaintiff achieved a specific goal that benefited a large class of people:  she had a policy that did not comply with the Administrative Procedure Act declared invalid.

Finally, in *Woodland Hills, supra*, 23 Cal.3d 917, the plaintiffs challenged the city council's approval of a subdivision map.  The plaintiffs alleged that the city's action was

21

invalid because the city council failed to make certain specific findings and failed to prepare a timely environmental impact report, among other things. (*Id.* at p. 926.) The high court determined that the then-recently enacted section 1021.5 applied to authorize attorney fees in that case.

Contrary to appellant's position, these cases do not stand for the proposition that an employee who successfully brings a wrongful termination claim can recover attorney fees under section 1021.5. Instead, the cases emphasize that some greater public benefit must be achieved before a wrongfully terminated employee can recover attorney fees under section 1021.5.

Appellant emphasizes that the trial court misstated the evidence in declaring that "[p]laintiff's reports to his employer were part of his job." Appellant insists that he in fact did more than his job required in reporting violations of time card fraud to his superiors. However, ultimately the question of whether appellant went beyond his job duties in reporting violations is not essential to a determination of whether attorney fees are appropriate under section 1021.5. The key question under section 1021.5 is whether, in his lawsuit, appellant sought and achieved an injunction or other remedy that significantly benefited the public.

Appellant did not bring this action to enjoin respondent from selling outdated food; nor did his lawsuit have the effect of enforcing food safety laws. Appellant did not bring this action to enjoin respondent from violating wage laws; nor did his lawsuit have the effect of enforcing wage laws. Like the *Flannery* and *Weeks* cases, the primary effect of this case was the vindication of appellant's own personal right and economic interest. The trial court did not abuse its discretion in so holding.

## DISPOSITION

The judgment is affirmed.  Respondent is awarded its costs of appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST